85 F.3d 839
 64 USLW 2733, 109 Ed. Law Rep. 1145
 Emily HSU and Timothy Hsu, By and Through their next friend,
Dr. Chin-Ching HSU, Plaintiffs-Appellants-Cross-Appellees,
v.
ROSLYN UNION FREE SCHOOL DISTRICT NO. 3; Michael Barkan, in
his official capacity as President of the Roslyn Union Free
School District Board of Education; Asenath Anderson, in
her official capacity as Vice President of Roslyn Union
Free School District Board of Education; William Costigan;
Barbara Schwartz; Pat Schissel; Ellen Seigel; Alvin
Silverman, in their official capacities as members of the
Roslyn Union Free School District Board of Education; Dr.
Frank Tassone, in his official capacity as Superintendent of
Roslyn Union Free School District; Marilyn Silverman, in
her official capacity as Assistant Superintendent of Roslyn
Union Free School District; Mark Weyne, in his official
capacity as Principal of Roslyn High School; and Dr. Howard
Rubin, in his official capacity as Principal of Roslyn High
School, Defendants-Appellees-Cross-Appellants.
 Nos. 332, 471, Dockets 95-7311, 95-7333.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 1, 1995.
Decided May 15, 1996.
 
 Jay Alan Sekulow, American Center for Law & Justice: Religious Liberties Project, Washington, DC (James Matthew Henderson, Sr., Stuart J. Roth, and Joel H. Thornton, American Center for Law & Justice, Religious Liberties Project, Washington, DC; Keith A. Fournier, American Center for Law & Justice, Virginia Beach, VA; Joseph P. Infranco, Migliore & Infranco, Commack, NY; on the brief), for Plaintiffs-Appellants-Cross-Appellees.
 Stanley A. Camhi, Garden City, NY (John O. Fronce, Jaspan, Ginsberg, Schlesinger, Silverman & Hoffman, Garden City, NY, on the brief), for Defendants-Appellees-Cross-Appellants.
 Steven Arenson, Arenson, Dittmar & Karban, New York, NY, and Steven M. Freeman and Debbie N. Kaminer, Anti-Defamation League, New York, NY, filed a brief, for Amicus Curiae Anti-Defamation League.
 Steven T. McFarland, Kimberlee Wood Colby, and Samuel B. Casey, Center for Law & Religious Freedom: Christian Legal Society, Annandale, VA, and Michael S. Paulsen, Minneapolis, MN, filed a brief, for Amici Curiae Christian Legal Society, National Council of Churches of Christ, National Association of Evangelicals, and Christian Life Commission of the Southern Baptist Convention.
 Mathew D. Staver, Frederick H. Nelson, and Nicole Arfaras Kerr, Liberty Counsel, Orlando, FL, filed a brief, for Amicus Curiae Liberty Counsel.
 Jay Warona, Pilar Sokol, and Cheryl Randall, New York State School Boards Association, Albany, NY, filed a brief, for Amicus Curiae New York State School Boards Association.
 Before VAN GRAAFEILAND, JACOBS and PARKER, Circuit Judges.
 JACOBS, Circuit Judge:
 Under the Equal Access Act, 20 U.S.C. §§ 4071-4074, public school students who wish to pray and study the Bible together after school enjoy the same right to meet in school classrooms as other extracurricular groups. The school can avoid the requirements of the Equal Access Act by prohibiting all "noncurriculum related" student groups or by declining federal funding. In this case, a public high school subject to the Act negotiated to impasse with a small group of students who wanted to form an after-school Bible Club. Agreement was reached on every aspect of the club's status and operation, but one. The students insisted on a club charter provision that only Christians could be club officers; the school refused recognition on the sole ground that this condition violated the school policy prohibiting all student groups from discriminating on the basis of (among other things) religion. The students sued, and moved for a preliminary injunction that would force the school to recognize the club. The United States District Court for the Eastern District of New York (Leonard D. Wexler, J.) denied the motion. We review that denial.
 
 
 1
 We conclude that the club's Christian officer requirement, as applied to some of the club's officers, is essential to the expressive content of the meetings and to the group's preservation of its purpose and identity, and is therefore protected by the Equal Access Act. This application of the Act is constitutional because the school's recognition of the club will not draw the school into an establishment of religion or impair the school's efforts to prevent invidious discrimination. We therefore affirm in part and reverse in part.
 
 I. Facts
 
 2
 Except for some immaterial details of chronology, the following facts are undisputed in the complaint, the answer, and the affidavits submitted to the district court.[1]
 
 
 3
 Roslyn High School (the "School") is a public school serving grades nine through twelve. Located in Roslyn, New York, the School is part of the Roslyn Union Free School District (the "District"). The District is governed by a Board of Education (the "Board"), which employs a Superintendent to implement its policies.
 
 
 4
 In September 1993, as Emily Hsu began her senior year at Roslyn High and her brother Timothy entered as a freshman, Emily met with the school's principal, Mark Weyne, to ask if she could form an after-school Christian Bible Club (the "Club"). He told her that he would look into it, and referred the matter to the office of the District Superintendent. In November 1993, the Assistant Superintendent for Curriculum and Instruction, Marilyn Silverman, met with Emily and Jane Shin (another Roslyn High student interested in forming a Bible club) "to obtain additional information about the club." Emily was told that the Board would discuss the Club at a December 2 meeting. Emily, Jane, and a third interested student, Johnny Whang, attended the meeting. After Emily and Jane explained their proposal to the Board, the Board had a "broad ranging discussion of the issue" and postponed final decision. Emily claims that during that discussion: a Board member stated that School officials did not want the Club to meet, but that they were legally required to grant the Club access; a second Board member suggested that the District should stop accepting federal funds in order to avoid the mandate of the Equal Access Act; and the Board indicated that it was tabling the proposal so that it could study in greater depth the consequences of forgoing federal money.
 
 
 5
 Several weeks after the Board meeting, Emily and Jane met with Silverman and Roslyn High's new principal, Howard Rubin. The two administrators asked the two students to submit a written constitution describing the proposed Club, so that the Board could make a fully informed decision about whether to recognize it.[2]
 
 
 6
 In early January 1994, Emily delivered to Silverman the Club's proposed constitution. Article I stated that the "Walking on Water" club would be open to all Roslyn High School students "regardless of race, color, age, religion, sex, national origin, or physical handicap." Article II stated that the Club would provide "a time of praise for students to gather in Christian fellowship," which was defined as a time "when Christians gather to praise God ..." (the "Christian fellowship provision"). Fellowship would be provided "in the form of singspiration[, that is,] singing inspirational music which exalts the Lord Jesus Christ...." Article III described the Club's weekly, hour-long meetings. Meetings would open and close with a prayer. The first half of the meetings would consist of "singspiration." The second half might include more prayer, more "singspiration," testimonies from students about their belief in Jesus Christ, guest speakers, skits, games, or Bible study. According to the Hsus, these activities were to be consistent with the Club's overarching goal of spending an hour of spirituality together "to praise God." Article IV listed potential projects for the Club, including volunteer community service, charitable fund raising, and picnics.
 
 
 7
 Article V concerned "Elections and Officers." Officers were to be elected in May for the following academic year by a majority vote of those students who attended two-thirds of the Club's meetings during the year. Five officer positions were created: President, Vice-President, Secretary, Music Coordinator, and Activities Counselor. The President would be "responsible for the overall spiritual direction and oversight of the Bible club ... [and] the spiritual content of the regular weekly meetings," and the Vice-President would help perform these responsibilities. The Secretary would take the minutes and do the accounting. Both the Vice-President and Secretary were to "be prepared to perform the presidential functions" in the President's absence. The Music Coordinator would select the "praise and worship songs" and "lead the singing and worship of the Lord" at "Singspiration time." The Activities Coordinator would plan the community service work, charitable fundraising, and picnics. All officers had to be prepared "to open or close a meeting with prayer or to lead a Bible study," and "to give testimony to the life-changing presence of Jesus Christ in his/her life." Article V required that all of these officers be "professed Christians either through baptism or confirmation" (the "leadership provision"). That provision is the bone of contention here.
 
 
 8
 In late January, Silverman and Rubin again met with Emily and Jane. They explained to the students that two provisions of the Club's constitution were unacceptable: the provision defining Christian fellowship as a gathering of "Christians," and the provision limiting officers to "professed Christians." Emily responded by crossing out the word "Christians" in the Christian fellowship provision, and writing in the more inclusionary word, "people." Emily was more unbending as to the School's second objection, however, and wrote the following sentences in the margin of the leadership provision: "All members eligible to vote will also be eligible to run for offices. Accepting Jesus Christ as savior is a requirement for all officers." (The second sentence thus imposed an eligibility requirement not implicit in the first sentence.)
 
 
 9
 The two administrators and two students met again on January 26. Silverman and Rubin explained to Emily and Jane that because the constitution's leadership provision still restricted officers to "professed Christians" and those who have "accepted Jesus Christ as savior," it violated the District's "nondiscrimination policy." This policy is embodied in two "equal opportunity statements" previously adopted by the Board. The first statement prohibits the Board from discriminating against any student "on the basis of race, color, national origin, creed or religion, marital status, sex, age or handicapping condition," in providing "access to ... student activities." The second statement requires that the District
 
 
 10
 provide every student with equal educational opportunities regardless of race, color, creed, sex, national origin, religion, age, marital status, or disability. No student will be excluded on such basis from participating in or having access to any course offerings, athletics, counseling, employment assistance, extracurricular activities or other school resources.
 
 
 11
 (Emphasis added.) The Walking on Water Club's exclusionary leadership policy violates the District's nondiscrimination policy, as all parties agree.
 
 
 12
 On January 31, Emily resubmitted the Club's constitution (with the handwritten changes) to Silverman and asked her to submit it to the Board. The Board met on February 3, discussed the Bible Club proposal, and resolved to give it "further study and consideration."
 
 
 13
 By this time, Emily Hsu had been trying to set up a Bible Club for five months and had still received no definitive answer from the Board. On February 16, Emily and her brother Timothy commenced this suit, alleging violations of the Equal Access Act, 20 U.S.C. §§ 4071-4074, the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4, the Free Exercise Clause, the Establishment Clause, the Free Speech Clause, the Equal Protection Clause, the Due Process Clause, their rights to free association under the First Amendment, and various provisions of the New York State Constitution. They asked for declaratory relief, unspecified damages, and preliminary and permanent injunctions that would prohibit the School from denying them "equal access to school facilities" and from violating their constitutional rights.[3]
 
 
 14
 On March 10, the Board officially recognized the Walking on Water Club on the condition that the Club remove its exclusionary officership policy. In relevant part, the Board's resolution stated:
 
 
 15
 Whereas, we are concerned that the formation of a religious club could lead to the feeling on the part of some students that they would be excluded or ostracized if they failed to participate in any organized prayers at such a religious club; and
 
 
 16
 . . . . .
 
 
 17
 Whereas, discrimination by a student club which limits a student's full participation in club activities because of the student's creed or religious beliefs would be detrimental to the education, welfare and well-being of the students attending the District's schools.
 
 
 18
 Now, therefore, be it resolved that we hereby approve the formation of said high school student Christian religious club on the following conditions:
 
 
 19
 1. Membership in the Club shall be limited to Roslyn High School students, and no student shall be discriminated against or excluded from participating in or having access to the Club, including without limitation entitlement to be an officer of the Club, on the basis of creed or religion.
 
 
 20
 2. A Roslyn Faculty member shall be assigned as a monitor to the Club in a non-participatory capacity only.
 
 
 21
 3. Non-school persons may not direct, conduct, control or regularly attend activities of said Club.
 
 
 22
 4. The Club shall be allowed to meet on school premises, but only during non-school hours.
 
 
 23
 5. In accordance with the Federal Equal Access Act, no public funds will be expended to support the Club or its activities beyond the incidental cost of providing meeting space and compensation for a monitor.
 
 
 24
 It is hereby further resolved that the Superintendent of Schools is hereby directed to cause all listings, communications and announcements issued by the District pertaining to said Club expressly to state that the Roslyn School District does not endorse the Club, but is mandated by the Federal Equal Access Act to permit the Club's activities, same to be on a voluntary basis and to be held on school premises during non-school hours only.
 
 
 25
 This qualified recognition forced the Hsus to accept a condition that they consider incompatible with the formation of their club. They believe that forcing the Club to accept the possibility of non-Christian officers "would influence the form and content" of the Club, and might alter the speech at the Club's meetings. Only if the Club's officers are Christian, say the Hsus, will the Club "serve the function we desire for it to serve." Because of their belief that the leadership provision is an integral part of the Club, they did not think it meaningful to form a club based on the School's conditional recognition, and have therefore treated the School's resolution as tantamount to non-recognition. They folded these arguments into an amended complaint, filed March 25.
 
 
 26
 On May 13, 1994, the district court held a hearing on the plaintiffs' request for a preliminary injunction and the defendants' motion for judgment on the pleadings. On February 21, 1995, the district court issued a thorough opinion denying the request for a preliminary injunction and denying the defendants' motion. 876 F.Supp. 445 (E.D.N.Y.1995). Rejecting the Hsus' Equal Access Act claim, the court held that the School "appears to have satisfied its obligation under the Act," id. at 456, by letting the Club meet "on the same basis" and "subject to the same terms and conditions" as other clubs. Id. at 454. Those "terms and conditions" (that is, the nondiscrimination policy) were reasonable, said the court, because they were "aimed at ... protecting the well-being of all students by ensuring equal and nondiscriminatory access of all students to student clubs." Id. at 455. The court concluded both that the nondiscrimination policy on its face did not violate the Establishment Clause, and that the Establishment Clause required that the nondiscrimination policy be applied to the Walking on Water Club, since an exemption for the Club would create an "unavoidable [ ] risk of excessive entanglement." Id. at 460. In addition, the court held that such an exemption would convey "a message of exclusion" and would permit "discrimination based on religion in the school setting." According to the court, this discrimination, like " 'racial discrimination in education[,] violates a most fundamental national public policy, as well as rights of individuals.' " Id. at 459 (quoting Bob Jones Univ. v. United States, 461 U.S. 574, 593, 103 S.Ct. 2017, 2029, 76 L.Ed.2d 157 (1983)). Finally, the court rejected the plaintiffs' free exercise, free speech, and free association claims on the ground that applying the School's nondiscrimination policy to the Club advanced, in the least restrictive manner possible, the School's compelling interest in "ensur[ing] all other students the right to be free from invidious discrimination in school, ... [since] a school-recognized club that is permitted to discriminate on the basis of religion likely would be disruptive to the educational mission of the school." Id. at 462-63.
 
 
 27
 The plaintiffs appeal the denial of their preliminary injunction motion.[4]
 
 II. Standard of Review
 
 28
 It is "normally appropriate" to review a district court's preliminary injunction decision under a deferential standard, determining whether the district court has abused its discretion, Thornburgh v. American College, 476 U.S. 747, 755, 106 S.Ct. 2169, 2175-76, 90 L.Ed.2d 779 (1986), rev'd on other grounds, Planned Parenthood v. Casey, 505 U.S. 833, 870, 112 S.Ct. 2791, 2816-17, 120 L.Ed.2d 674 (1992), either by "an error of law," Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir.1994) (internal quotations omitted), or by "applying an incorrect legal standard." Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 780 (2d Cir.1994). However, the presumption that we review a preliminary injunction decision for "abuse of discretion" is "a rule of orderly judicial administration, not a limit on judicial power." Thornburgh, 476 U.S. at 757, 106 S.Ct. at 2177. The appropriate level of deference afforded to a preliminary injunction decision is "not inflexible." Id. at 756, 106 S.Ct. at 2176. For instance, we held in Romer v. Green Point Savings Bank, 27 F.3d 12, 16 (2d Cir.1994), that preliminary injunction decisions must undergo "greater scrutiny" when they "effectively award victory in the litigation":
 
 
 29
 When a district court's order, albeit in the form of a TRO or preliminary injunction, will finally dispose of the matter in dispute, it is not sufficient for the order to be based on a likelihood of success or balance of hardships ...; the district court's decision must be correct (insofar as possible on what may be an incomplete record), and appellate review should be plenary.
 
 
 30
 Id. And in Thornburgh, the Supreme Court explained why the Third Circuit had been correct to conduct "plenary review" of the district court's denial of a preliminary injunction:
 
 
 31
 [I]f a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction.
 
 
 32
 Id. at 757, 106 S.Ct. at 2177; see also Blum, 18 F.3d at 1010 ("abuse of discretion" standard applies "[w]here the facts are of controlling relevance"). Judge Friendly offered a similar explanation in applying "a broad standard of review" in Donovan v. Bierwirth, 680 F.2d 263, 270 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982):
 
 
 33
 There is no real dispute over what did and what did not occur. The quarrel is over the legal standard and its application to facts not seriously in dispute.... We would ill perform our duties by a decision affirming the district court because of limitations on the scope of review....
 
 
 34
 See also Henry J. Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 777-78 (1982).
 
 
 35
 As these cases make clear, deferential review is justified by the circumstances ordinarily accompanying preliminary injunction rulings: expedited proceedings and untested facts produce tentative rulings with provisional consequences, allowing room for a different ultimate outcome. However, when these circumstances are absent and the district court ruling resembles a final decision on the merits, there is less justification for substantial deference. We therefore consider the nature of the district court's ruling.
 
 
 36
 Presented with a preliminary injunction motion, the district court (naturally) decided the substantive issues in that framework. Its decision, however, resembles more closely a grant of summary judgment to the defendants. First, as in Thornburgh and Donovan, "the facts [we]re established," and the only dispute was over the correct legal standard to apply. There is no sign that the factual record needs development or that factual disputes need resolution before the merits of the plaintiffs' claims can be finally decided. The district court expressed no such need at the two-day hearing or in its opinion, and the parties expressed no such need, then or after.
 
 
 37
 Second, there is no indication that the district court's consideration of this case was abbreviated by any perceived time constraint, as is common in a preliminary injunction proceeding. The plaintiffs' amended complaint was filed in March 1993, the hearing was held two months later, and the request for "preliminary" injunctive relief was denied in February 1994, eleven months later. At that point, Emily Hsu had been a graduate of Roslyn High for eight months, and Timothy Hsu was well into his sophomore year.
 
 
 38
 Third, the purpose of the preliminary injunction motion was not the ordinary goal of "preserv[ing] the relative positions of the parties." Thornburgh, 476 U.S. at 755, 106 S.Ct. at 2175-76. The preliminary injunction motion sought an order requiring the School to recognize the Walking on Water Club on its terms, thus altering the status quo. Moreover, the injunction was likely to give these plaintiffs the only opportunity that the courts could likely afford for them to participate in the Club.
 
 
 39
 In these ways, the district court's decision, explained by a decisive and categorical opinion, resembled a definitive ruling on the merits of the plaintiffs' claims.[5] As in Romer, the district court's decision "effectively award[ed] victory in the litigation." And as in Thornburgh and Donovan, the district court's resolution of the case hinged not on what the facts were--since the material ones are undisputed--but on how the law should be applied. As a result, our review of the district court's denial of a preliminary injunction is plenary.
 
 III. The Hsus' Rights
 
 40
 A preliminary injunction is granted if the party seeking the relief establishes two elements: first, the party will suffer "irreparable harm" if the injunction is denied; second, either the moving party is likely to succeed on the merits, or there are "sufficiently serious questions going to the merits" and the "balance of hardships tip[s] decidedly" its way. Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir.1991). The district court ruled that the Hsus would carry their burden as to the first element if the School denied them their First Amendment rights:
 
 
 41
 If, as plaintiffs contend, they are being deprived of their First Amendment rights by defendants' nondiscrimination policy, they have and will continue to sustain irreparable harm. As the Supreme Court has stated: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, [427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976)] . . . . Accordingly, this Court finds that plaintiffs have demonstrated that they will suffer irreparable harm.
 
 
 42
 876 F.Supp. at 451. The district court's finding of irreparable harm was thus conditioned on the conclusion (ultimately rejected by the district court) that the Hsus were being deprived of free speech rights. Since the irreparable harm inquiry depends on the merits of the claims, we turn to the merits, asking whether the Hsus are "likely to succeed," and consider irreparable injury at the end of our opinion.
 
 
 43
 The Hsus make two statutory and several constitutional claims. Consistent with our practice of avoiding constitutional questions wherever possible, we begin with the Hsus' statutory claims. See Jean v. Nelson, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985) (it is "a fundamental rule of judicial restraint" that "[p]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision" (internal quotations omitted)); Montilla v. INS, 926 F.2d 162, 168-69 (2d Cir.1991) (same).
 
 A. Equal Access Act: Generally
 
 44
 Enacted in 1984, the Equal Access Act ("Act"), 20 U.S.C. §§ 4071-4074, guarantees the right of public school students to form extracurricular groups that engage in religious, philosophical, or political discourse. Section 4071(a) creates this statutory free speech right[6]:
 
 
 45
 It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.
 
 
 46
 There is no doubt that Roslyn High School is a "public secondary school" that has a "limited open forum"[7] and receives federal funds. Thus, the Hsus' claim turns on whether the School denied them "equal access ... on the basis of the religious ... content of the speech" that would have taken place at their meetings.[8]
 
 
 47
 There is scant authority to guide us in our effort to interpret these statutory terms. The legislative history of the Act[9] indicates that its authors sought to end discrimination against religious extracurricular groups in public schools by mandating a policy of neutrality. See 130 Cong. Rec. 19,224 (1984) (statement of Sen. Hatfield). To the Act's authors, "equal access" meant that "secondary school students engaging in religious speech have the same rights to associate together and to speak as do students who wish to meet to discuss chess, politics, or philosophy." Id. at 19,216 (Sen. Denton) (emphasis added).
 
 
 48
 Supporting and opposing members of Congress worried that this grant of protection for student speech was too broad and the intrusion on school autonomy too great; specifically, they expressed concern that a law intended to ensure that after-school prayer groups could meet would leave a school powerless to bar the Ku Klux Klan, cults, or intrusive proselytizers.[10] Though Senator Hatfield, the Senate's primary sponsor, thought this concern was overstated, arguing that the Act still allowed schools to outlaw groups that "would be disruptive to the purpose of [the] school ... [, including a group like] the American Nazi Party ... that is dedicated to the purpose of dividing people, on grounds of race or religion," id. at 19,224, he admitted that "we are [not] going to be able to anticipate every possible instance that will arise under this expansion of rights...." Id. at 19,225.[11] Indeed, the members of Congress do not appear to have anticipated the situation that confronts us: there is no discussion in the legislative history about whether "equal access" allows an after-school religious club to limit its leaders to those of a particular religious faith. Nor did members of Congress discuss whether the term "speech at [the] meetings" includes a leadership eligibility requirement that is intended to guarantee that the speech at the club meetings will have a particular content.
 
 
 49
 Though the Supreme Court interpreted the Equal Access Act in Board of Educ. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), that case also provides only limited guidance about how to interpret the statutory terms that concern us. In Mergens, students at a Nebraska public high school wanted to form an after-school Christian club, open to students of all religions, for prayer and Bible discussion. Id. at 232, 110 S.Ct. at 2362-63. The students sought the school's official recognition, which would have given the club "access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair." Id. at 247, 110 S.Ct. at 2370. The students' proposal contemplated that there would be no faculty adviser. Id. at 232, 110 S.Ct. at 2362-63. See 20 U.S.C. §§ 4071(c)(2) & 4072(2). The school denied recognition on the grounds that every recognized club needed a faculty sponsor, and that recognition of a religious club would violate the Establishment Clause. Mergens, 496 U.S. at 232-33, 110 S.Ct. at 2362-63.
 
 
 50
 The Supreme Court held that the Equal Access Act required recognition of the club, and that the Act on its face and as applied did not violate the Establishment Clause. (We address the Establishment Clause aspect of the Court's decision in section IV, infra.) In discussing whether the school's refusal to recognize the Bible club fell within the terms of the statute, the Court concerned itself almost exclusively with the meaning of the term "noncurriculum related student groups," a concept not at issue in our case.[12] The final paragraph of the Court's statutory interpretation section briefly discussed the term "equal access," holding simply that to deny the Bible Club "official recognition" (including denial of access to the school newspaper, bulletin boards, and public address system) was to deny it "equal access." Id. at 247, 110 S.Ct. at 2370.
 
 
 51
 This Court has had no occasion to consider the Equal Access Act. Two other circuits have interpreted the Act, see Ceniceros v. Board of Trustees, 66 F.3d 1535 (9th Cir.1995); Garnett v. Renton School Dist. No. 403, 987 F.2d 641 (9th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993); Pope v. East Brunswick Bd. of Educ., 12 F.3d 1244 (3d Cir.1993); Student Coalition for Peace v. Lower Merion School Dist., 776 F.2d 431 (3d Cir.1985), but none of these cases addresses the situation presented here or construes the wordings that concern us. In interpreting the Act, we therefore rely on the common meanings of the words themselves, the logic and architecture of the Act, the congressional purpose of providing religious clubs with the "same rights" as other clubs, the Supreme Court's direction in Mergens that the Act is to be "interpreted broadly," 496 U.S. at 239, 110 S.Ct. at 2366, and Supreme Court cases from analogous areas of the law.
 
 
 52
 B. "[R]eligious ... content of the speech ...".
 
 
 53
 Did the School refuse to recognize the Hsus' club "on the basis of the religious ... content of the speech at [the Club's] meetings"? One might argue that there is no "speech" at issue here. After all, the School did not base its qualified recognition of the Club on what would be said at the Club meetings, but on what could be characterized as the Club's "act" of excluding non-Christians from leadership. The School has demonstrated that it would recognize the Walking on Water Club (or any other religious club) without regard to the content of the club's prayers or discussions, so long as no religious exclusions were made.
 
 
 54
 We are therefore confronted with difficult issues about the meaning of the statutory term "speech." We conclude that, in light of the Supreme Court's command that we construe the Act broadly, the term "speech" includes the Walking on Water's Club leadership policy provision, to the extent that it is reasonably designed to assure that a certain type of religious speech will take place at the Club's meetings.[13] We take guidance from the Supreme Court's recent decision in Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, --- U.S. ----, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). In that case, the Court recognized that the message a group imparts sometimes depends upon its ability to exclude certain people, and that this exclusion may be protected by the First Amendment. The veterans group that organized the annual St. Patrick's Day parade in Boston refused to let an Irish gay pride group march with a gay pride banner. The Massachusetts courts held that this exclusion ran afoul of the state's public accommodations law, which prohibited discrimination on the basis of, inter alia, sexual orientation. Id. at ---- - ----, 115 S.Ct. at 2341-43. The Supreme Court reversed, holding that this application of the state law violated the parade organizers' First Amendment free speech rights. Id. at ----, 115 S.Ct. at 2343. The Court noted that the parade did not exclude gay people in general, but rather excluded a group of gay people that wanted to communicate a particular message during the parade. By excluding that group, the parade organizers sought to "tailor" their own message by omitting a particular communication from the banners that constituted their speech, id. at ----, 115 S.Ct. at 2347, and by "select[ing] the expressive units of the parade from potential participants."[14] Id. at ----, 115 S.Ct. at 2348. The lesson we draw from Hurley is that the principle of "speaker's autonomy" gives a speaker the right, in some circumstances, to prevent certain groups from contributing to the speaker's speech, if the groups' contribution would alter the speaker's message.
 
 
 55
 Hurley does not control this case, because (first) it concerns speech rights under the Constitution, not a federal statute, and (second) the Club's proposed exclusion differs somewhat from the exclusion at issue in Hurley. Here, we are not faced with the exclusion of a discrete group that will definitely communicate a specific message if included. Rather, a broad cross-section of people is excluded from leadership in the Club because they lack a personal characteristic or belief, without any showing that they would desire to communicate any particular message.
 
 
 56
 Despite these two differences, Hurley remains instructive. First, since the Act creates an analog[15] to the First Amendment's default rule banning content-based speech discrimination, cases discussing the meaning of "speech" in First Amendment jurisprudence are also interpretive tools for understanding the Act. Second, the exclusions here and in Hurley are too similar to be meaningfully distinguished. As in Hurley, the Club's decision to exclude is based on its desire to preserve the content of its message. The Hsus claim that having Christian leaders necessarily shapes the content of the religious speech at their meetings, because the nature and quality of the speech at the meetings is dependent upon the religious commitment of the officers. We can accept this claim to the extent that there is an integral connection between the exclusionary leadership policy and the "religious speech" at their meetings. No party or amicus is challenging the idea that the activities of this Club will consist of "religious speech." We accept--as the parties and the district court have apparently accepted--that the purpose of the Club is to organize participation in activities that will be in the nature of religious devotions.
 
 
 57
 However, as we review the Club's constitution, we see that some of the activities are not unambiguously "religious." Although meetings will consist mostly of prayers, "singspiration" (a form of musical prayer), Bible readings, and testimonies about the impact of Jesus Christ in the students' lives, the Club's constitution also lists guest speakers, skits, and games as possible activities at the meetings.[16] There is no reason to limit the range of activities that may be undertaken by an after-school religious club that discriminates, so long as the activities are integral to a sectarian religious experience. But to the extent that such a group engages in social and community activities that are not integral to a sectarian religious experience, it is in danger of becoming merely a religious affinity group practicing social exclusion. The entire thrust of the Hsus' case, the School's resistance, and the amici's arguments assumes that the activities at the Club's meetings promote and express the Christian religious experience in an integral way, and we proceed on this assumption.
 
 
 58
 On the other hand, the constitution also lists picnics and volunteer community service as Club activities, events which would obviously take place outside of the Club's meetings at the schoolhouse. Taking an expansive view, one can say that religion suffuses all the conduct of a pious person, so that the worshipful contemplation of nature on a picnic, as well as acts of charity and service, may all be deemed to have a religious dimension. However, this is not "religious speech" within the meaning of the Equal Access Act, if only because it will not occur at a "meeting." In addition, there is no reason to believe, based on the present record, that the planning of a picnic or a service project must be done by a Christian in order to make it meaningful for Christian students. In the Walking on Water Club, the planning of these non-school activities is the only responsibility of the Activities Coordinator, who, according to the Hsus, must ensure that the activities do not "offend Christian sensibilities." But an agnostic with an understanding of "Christian sensibilities" might plan these activities as well as any other student. Similarly, it is very difficult to understand why the "religious speech" at the Walking on Water Club meetings would be affected by having a non-Christian "Secretary," whose principal duties are "to accurately record the minutes of meetings and be involved in the Club's financial accounting and reporting."
 
 
 59
 The Hsus claim that all officers, including the Secretary and Activities Coordinator, must be prepared to "open or close a meeting with prayer ... or to lead a Bible study" and that this duty justifies the exclusion of non-Christians from those posts. But this assertion has no limiting principle. Anyone in attendance at a religious meeting may be called upon for a benediction or to "lead a Bible study." There is thus no difference between (a) the Hsus' desire to discriminate in the selection of numerous officers of a small club, each of whom may be called upon to officiate briefly, and (b) a religious test for membership or attendance, which is plainly insupportable.[17]
 
 
 60
 The leadership provision is defensible, however, as to the President, Vice-President, and Music Coordinator of the Club, because their duties consist of leading Christian prayers and devotions and safeguarding the "spiritual content" of the meetings. Guaranteeing that these officers will be dedicated Christians assures that the Club's programs, in which any student is of course free to participate, will be imbued with certain qualities of commitment and spirituality. Thus, we conclude that the decision to allow only Christians to be President, Vice-President, or Music Coordinator is calculated to make a certain type of speech possible, and will affect the "religious ... content of the speech at [the] meetings," within the meaning of the Equal Access Act.[18] From this point on, our reference to the Club's exclusionary leadership policy refers only to the exclusion of non-Christians from these three leadership positions.
 
 
 61
 In interpreting the term "speech," we are also guided by a set of Supreme Court cases similar to Hurley, although analyzed under the Court's freedom of association jurisprudence. The right to free association for expressive purposes is implicit in the First Amendment free speech guarantee. See NAACP v. Alabama ex. rel. Patterson, 357 U.S. 449, 460-61, 78 S.Ct. 1163, 1170-71, 2 L.Ed.2d 1488 (1958); Abood v. Detroit Bd. of Educ., 431 U.S. 209, 233, 97 S.Ct. 1782, 1798, 52 L.Ed.2d 261 (1977). That right is an instrumental one: expressive association is protected "as an indispensable means of preserving other individual liberties." Roberts v. United States Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). The right to associate also includes the right not to associate. Id. at 623, 104 S.Ct. at 3252-53.
 
 
 62
 The Supreme Court examined the scope of this right in Roberts and Board of Directors of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). In both cases, the Court upheld the application of state antidiscrimination laws to private civic clubs that wished to continue their exclusion of women as members. Although the Court determined that the statutes infringed on the expressive association rights of the private clubs, "that infringement [was] justified because it serves the State's compelling interest in eliminating discrimination against women." Rotary, 481 U.S. at 549, 107 S.Ct. at 1948. See also Roberts, 468 U.S. at 623, 104 S.Ct. at 3252-53; New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 11-12, 108 S.Ct. 2225, 2233-34, 101 L.Ed.2d 1 (1988) (rejecting a facial challenge to a nondiscrimination statute, on the ground that the freedom of expressive association was not infringed upon by all applications of the statute).
 
 
 63
 Roberts and Rotary (like Hurley ) are analytically distinct from this case, because they involve constitutional rights, not statutory ones. Nevertheless (like Hurley ) they assist our interpretation of the term "speech" in the Equal Access Act. The Act, which protects students only against the denial of equal access on the basis of their "speech," does not expressly protect their right to "associate." But since the grant of speech protection is to "students who wish to conduct a meeting," the right to associate for the purpose of holding such a meeting is a necessary corollary. The Act's authors made it clear that the language of § 4071(a) was intended to protect both free speech and free association rights of certain student clubs. 130 Cong. Rec. 19,216 (1984) (statement of Sen. Denton); id. at 19,217 (Sen. Hatfield). Thus, the Act contains an implicit right of expressive association when the goal of that association is to meet for a purpose protected by the Act.
 
 
 64
 As in Roberts and Rotary, when the students' desire to hold a meeting covered by the Act involves a decision not to associate with other students, that decision, depending on its purpose, may constitute an exercise of the students' right of expressive association. On the one hand, an exclusion solely for reasons of hostility or cliquishness, with no direct bearing or effect on the group's speech, does not implicate the right to expressive association. But expressive association is implicated when the decision to exclude is made in order to foster the group's shared interest in particular speech. See William P. Marshall, Discrimination and the Right of Association, 81 Nw. U.L.Rev. 68, 78-80, 90-91 (1986). As the Court said in Roberts, a regulation that prevents a group from excluding certain people "may impair the ability of the original members to express only those views that brought them together." 468 U.S. at 623, 104 S.Ct. at 3252 (emphasis added). Similarly, the Court in New York State Club Association stated that
 
 
 65
 an association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion.
 
 
 66
 487 U.S. at 13, 108 S.Ct. at 2234 (emphasis added).
 
 
 67
 It is undisputed that the decision by the Walking on Water Club to impose a religious test for leadership positions has been made purely for expressive purposes--to guarantee that meetings include the desired worship and observance--rather than for the sake of exclusion itself. As we have explained, supra, this test serves this expressive purpose for three of the leadership positions. As in other instances in which a limitation on the right to associate for expressive purposes has been held to infringe on the right to free speech, the School's refusal to allow the Walking on Water Club to guarantee that Christians will lead its Christian prayers implicates free speech rights under the Act. This does not mean, however, that the students' Equal Access Act claim automatically prevails. On the constitutional level, the right to free association is not absolute. Roberts and Rotary make clear that a "compelling" governmental interest (such as eliminating discrimination against women) will override the right to expressive association. Roberts, 468 U.S. at 623, 104 S.Ct. at 3252-53; Rotary, 481 U.S. at 549, 107 S.Ct. at 1947-48. And, since the students' right to expressive association here is based on a statute applicable to public schools--where free speech rights receive somewhat less protection generally--it is not at all apparent that a governmental interest need be "compelling" to override the expressive association rights at issue here. We ask in sections IV and V, infra, whether the School has a valid reason (under the Constitution or otherwise) for denying the Club the recognition it seeks. We can conclude at this point, however, that when an after-school religious club excludes people of other religions from conducting its meetings, and when that choice is made to protect the expressive content of the meetings, a school's decision to deny recognition to the club because of the exclusion is a decision based on "the content of the speech at [the] meetings," within the meaning of the Equal Access Act.
 
 
 68
 C. "[E]qual access".
 
 
 69
 The District argues that "equal access" has not been denied. It claims that it is applying its nondiscrimination policy neutrally to all after-school clubs, that this equal treatment amounts to "equal access," and that recognition of the Walking on Water Club, with its discriminatory constitution, would afford the Club special treatment, a level of accommodation that the Act does not demand.
 
 
 70
 The District's focus on the even application of its nondiscrimination rule misses the point. The Act mandates that students be given "equal access," not that the School's internal rules be administered uniformly. A rule against wearing hats in the school building, perfectly and consistently enforced, might deprive Jewish students of equal access to after-school facilities for shared religious observance. Similarly, a rule requiring students to wear appropriate footwear at all times, perfectly and consistently enforced, might effectively ban after-school meetings of the Yoga Club. The neutral application of the School's rules allows the School to say that it is treating all clubs equally. But exemptions from neutrally applicable rules that impede one or another club from expressing the beliefs that it was formed to express, may be required if a school is to provide "equal access."
 
 
 71
 The District argues that allowing the Hsus to discriminate on the basis of religion would grant them special rights: since the Chess Club may not limit its officers to Muslims, even if its founding members trust only Muslims to lead them, then the Walking on Water Club may not limit its officers to Christians. We agree that the Hsus are only entitled to the same rights that other student clubs have. But the District's argument ignores the fact that the Walking on Water Club is a religious club and the Chess Club is not. Walking on Water Club meetings will include certain types of religious prayers and songs. The Club's leadership eligibility requirement on the basis of religion is therefore similar to a chess club's eligibility requirement based on chess. Though the District argues that only those exclusions based on "ability and performance" are appropriate, this ignores one of the principal ways in which many extracurricular clubs typically define themselves: by requiring that their leaders show a firm commitment to the club's cause. The record does not include the constitutions of other extracurricular clubs at Roslyn High School,[19] but it would be sensible--and unremarkable in light of the clubs' particular purposes--for the Students Protecting the Environment Against Contamination Club to require that officers have a demonstrated commitment to conservation or recycling; for Students Against Drunk Driving to require that officers have taken the pledge; or for Students for Social Responsibility to require that officers have a social conscience. Similarly, a hypothetical school scouting club could preserve its character and values by requiring that officers be exemplars of the scouting movement, just as a hypothetical Marxist discussion group could require that officers be dedicated to socialist values or be card-carriers.
 
 
 72
 All of these "tests" of an officer's commitment to the group's cause allow the group to ensure that its agenda will be advanced at its meetings. One can expect that students in favor of contaminating the environment will lead different meetings than those against contamination, for instance. Similarly, the Hsus may reasonably expect that the prayers at a Club meeting led by non-Christians would be different than the prayers led by Christians. Seen in this light, the discrimination practiced by the Walking on Water Club merely requires that its officers have a certain level of commitment to the program and purpose of the Club. Because that program and purpose are religious and sectarian, the requisite level of commitment and belief is quite naturally expressed in terms of religious belief.[20] Equal treatment should mean that the Walking on Water Club enjoys the same latitude that other clubs may have in determining who is qualified to lead the Club. Thus, just as a secular club may protect its character by restricting eligibility for leadership to those who show themselves committed to the cause, the Hsus may protect their ability to hold Christian Bible meetings by including the leadership provision in the club's constitution.
 
 
 73
 This type of commitment requirement may be especially important to religious clubs. The Equal Access Act provides that "employees or agents of the school ... [may be] present at religious meetings only in a nonparticipatory capacity." 20 U.S.C. § 4071(c)(3). Though the Act provides protection for political and philosophical clubs as well as religious clubs, this provision of the Act singles out religious clubs, denying only to them the opportunity to have faculty sponsors (presumably because of Establishment Clause concerns). Thus, while political clubs and chess clubs may have faculty sponsors to promote institutional stability, help guarantee that new leaders are committed to the club's cause, and ensure that the club remains true to its purpose, religious clubs do not have that protection. It is therefore particularly understandable that a religious group would seek to assure in other ways that its leadership is genuinely committed to its cause.
 
 
 74
 The District argues that its nondiscrimination policy does not in any way hamper the ability of Club members to express their religious beliefs. After all, says the District, the nondiscrimination policy "does not require that a 'non-Christian' lead the club. [Club] members are free to elect whomever they believe will be the best leader and may cast their vote according to their conscience." The district court took a similar view, suggesting that the School's nondiscrimination policy did not actually prevent the Hsus from forming a club with Christian leaders, because the Club could rely on "[e]lective forces" to make sure that its desired leaders were chosen.[21] 876 F.Supp. at 455. The Hsus' concern that the Club "risk[ed] facing 'non-Christian leadership' " and might be "taken over" by students inimical to the Club's purpose was dismissed by the court as "speculation." Id. at 456. But of course, it is also speculation at this point to conclude that there would be no hostility toward a Christian Bible Club at Roslyn High. We simply do not know. And considering that (i) the Club may not have a faculty sponsor and (ii) religious groups have historically been the object of hostility and persecution more often than, say, chess players or glee clubs, the Hsus' concern that their effort to pray and discuss the Bible after school might be disrupted, though speculative, is by no means unreasonable. In any event, it is not disputed that this concern has been enough to chill their speech.
 
 
 75
 More importantly, telling the Club to rely on elections to assure that its leaders are Christians contemplates that the Club will engage in the same type of religious discrimination embodied in the Club's constitution. The School cannot have it both ways. If it insists on outlawing all religious discrimination, including clubs with discriminatory constitutions, it can scarcely recognize clubs that elect officers on the basis of their religion. But since the whole purpose of the Club is to gather for sectarian praise and worship (as the School and district court have recognized), the need for the Hsus to realize that purpose justifies the imposition of a religious test for the leaders of the after-school meetings. Thus, the School's complete ban on "religious discrimination," however it is enforced, also bans the Bible club envisioned by the Hsus.
 
 
 76
 We therefore reject the District's argument that the Hsus could abandon the leadership provision of the Club's constitution without suffering any tangible harm. Under the Equal Access Act, the Hsus may try to preserve the content of the religious speech at their meetings by discriminating in a way that ensures that the Club's leaders will be committed to both its cause and a particular type of expression. The School's recognition of the Club only on the condition that it abandon this effort therefore constitutes a failure to provide equal treatment, and denies the Walking on Water Club "equal access." In short, the Hsus are likely to succeed on their claim that Roslyn High violated § 4071(a) of the Equal Access Act, to the extent that the Club's leadership provision applies to the President, Vice-President, and Music Coordinator of the Club.[22]
 
 
 77
 By concluding that the School's non-recognition denies the Hsus "equal access," we are giving the term "equal access" the broad construction that the Supreme Court requires. See Mergens, 496 U.S. at 239, 110 S.Ct. at 2366. This does not mean, however, that all efforts by a student club to exclude other students are protected by the statute, even if the exclusion is based on a club's desire to realize its expressive purpose. The Equal Access Act is not a set of federal handcuffs fitted to school principals. Schools must have rules to control their students, and rules will always have the effect of suppressing someone's idea for a club. Though the School's effort to apply its nondiscrimination rule is trumped by the Equal Access Act, the Act's mandate of equal access can be trumped by the School's responsibility for upholding the Constitution, for protecting the rights of other students, and for maintaining "appropriate discipline in the operation of the school." See Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969) (internal quotations omitted). These are substantial limitations on the statute's intrusive power. We turn to them now and ask whether this application of the statute is both constitutional and consistent with a public school's mission.
 
 IV. The Establishment Clause
 
 78
 The School, with support from the Anti-Defamation League as amicus curiae, claims that exempting the Walking on Water Club from its nondiscrimination policy would violate the Establishment Clause by conferring upon a Christian club a benefit that other clubs do not enjoy. This exemption would violate all three prongs of the so-called "Lemon test," runs the argument, because the exemption would have no secular purpose, would have the primary effect of advancing religion, and would excessively entangle the School in religious matters. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111-12, 29 L.Ed.2d 745 (1971). The School also claims that providing the Club with an exemption would "encourage and pressure" students to join the Club and become practicing Christians. The Anti-Defamation League argues principally that the exemption constitutes "an endorsement" of the Club by the School, and creates a "symbolic union" between the two.
 
 
 79
 Most of the arguments advanced by the School and the Anti-Defamation League are answered in two opinions of the Supreme Court: Mergens, and Corporation of the Presiding Bishop v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). In Mergens, the Supreme Court held that the Equal Access Act does not violate the Establishment Clause. Writing for four justices, Justice O'Connor applied the "Lemon test," and concluded that the Act satisfied all three requirements.[23] First, the plurality quickly concluded that the Act had a secular purpose:
 
 
 80
 Congress' avowed purpose--to prevent discrimination against religious and other types of speech--is undeniably secular. See Amos, 483 U.S. at 335-36 [107 S.Ct. at 2868-69].... Because the Act on its face grants equal access to both secular and religious speech, we think it clear that the Act's purpose was not to endorse or disapprove of religion.
 
 
 81
 Id., 496 U.S. at 249, 110 S.Ct. at 2371 (internal quotations omitted). Second, the Act did not have the primary effect of advancing religion. Rejecting the school's arguments that religion is advanced when club meetings are "held under school aegis" at a place where "compulsory attendance laws ... provide a ready-made audience for student evangelists," id., the plurality concluded that there was no "symbolic link" between the school and religion:
 
 
 82
 [T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis. Cf. [Tinker ]....
 
 
 83
 . . . . .
 
 
 84
 To be sure, the possibility of student peer pressure remains, but there is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate.... To the extent a school makes clear that its recognition of respondents' proposed club is not an endorsement of the views of the club's participants, students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, religious speech.
 
 
 85
 Id. at 250, 251, 110 S.Ct. at 2371, 2372 (citation omitted). Finally, the plurality concluded that there was no "excessive entanglement" between the school and the religious club, because § 4071(c) of the Act prohibited the school from sponsoring or being involved in any way with the club's meetings. Id. at 253, 110 S.Ct. at 2373-74.
 
 
 86
 In Amos, the Court rejected Establishment and Equal Protection Clause challenges[24] to § 702 of the Civil Rights Act of 1964, which exempts religious organizations from the Act's ban on religious discrimination in employment. Again, the Court applied the three-prong "Lemon test." First, in examining whether § 702 meets the secular purpose requirement, the Court explained that the requirement
 
 
 87
 does not mean that the law's purpose must be unrelated to religion.... Rather, Lemon 's "purpose" requirement aims at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.
 
 
 88
 483 U.S. at 335, 107 S.Ct. at 2868. The Court concluded that § 702 had a secular purpose because it was motivated by the desire "to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Id. at 335-36, 107 S.Ct. at 2868. In its discussion of the test's second prong, the Court again stressed that a law conferring direct benefits only on religious groups does not necessarily have the primary effect of advancing religion. Pointing out that it had upheld a number of laws that helped religious groups "advance their purposes," such as a property tax exemption for religious groups, id. at 336, 107 S.Ct. at 2869, the Court explained:
 
 
 89
 A law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose.... [I]t must be fair to say that the government itself has advanced religion through its own activities and influence.
 
 
 90
 Id. at 337, 107 S.Ct. at 2869; see also id. at 338, 107 S.Ct. at 2869-70 ("[T]he Court ... has never indicated that statutes that give special consideration to religious groups are per se invalid."). The Court held that § 702 did not advance religion, rejecting the district court's contrary finding that "the exemption would permit churches with financial resources impermissibly to extend their influence and propagate their faith by entering the commercial, profit-making world." Id. at 337, 107 S.Ct. at 2869. Finally, the Court dismissed concerns regarding excessive entanglement, stating that § 702 actually "effectuates a more complete separation" of religion and the government. Id. at 339, 107 S.Ct. at 2870.[25]
 
 
 91
 Applying the lines of analysis adopted by the Court in these two cases,[26] we conclude that the School's recognition of the Walking on Water Club would not violate the Establishment Clause.
 
 
 92
 A. Secular Purpose.
 
 
 93
 As the Court has pointed out, the government may not act with the purpose of "endors[ing]" religion, Mergens, 496 U.S. at 249, 110 S.Ct. at 2371, or "promoting a particular point of view in religious matters." Amos, 483 U.S. at 335, 107 S.Ct. at 2868. There is no promotion or endorsement of religion here, as the defendants themselves have made clear. When the Board issued its conditional resolution recognizing the Walking on Water Club (without the Christian-only leadership provision on which the Hsus insist) the Board drew a cordon sanitaire between the School and the Club:
 
 
 94
 the Superintendent of Schools is hereby directed to cause all listings, communications and announcements issued by the District pertaining to said Club expressly to state that the Roslyn School District does not endorse the Club, but is mandated by the Federal Equal Access Act to permit the Club's activities.
 
 
 95
 These terms meet the requirement of Justice Marshall's concurrence in Mergens (which, of the three opinions finding no Establishment Clause violation, was the one most worried about the tension between the Clause and the Equal Access Act, see supra note 23), that the School must "disassociate itself from the Club's religious speech" by, for example, "affirmatively disclaim[ing] any endorsement of the Christian club." 496 U.S. at 270, 110 S.Ct. at 2382 (Marshall, J., concurring). Assuming that the School were to retain a similar disclaimer in recognizing the Walking on Water Club with its exclusionary policy, the School's stated purpose could not be mistaken for an endorsement. In any event, recognition of the Club in compliance with the Equal Access Act will serve the same purpose as Congress's purpose in passing the statute: "to prevent discrimination against religious and other types of speech." Id. at 249, 110 S.Ct. at 2371; see supra section III.C.
 
 
 96
 Even when the School's recognition is viewed in terms of an exemption from an overall nondiscrimination policy, the first branch of the "Lemon test" is still satisfied, as Amos demonstrates. Section 702 of the Civil Rights Act of 1964 gives religious groups an exemption from a generally applicable nondiscrimination law. In finding a secular purpose for that provision, the Amos Court stressed that a law's purpose need not be "unrelated to religion." 483 U.S. at 335, 107 S.Ct. at 2868. Here, the purpose for exempting the Club would be similar to the purpose underlying § 702: to "alleviate significant governmental interference with the ability" of the Club to engage in after-school prayers. See id. As discussed above, the Club reasonably insists that the actual leaders of its Christian prayers be Christians, on the assumption that only they have the necessary commitment and faith to do the job. The nondiscrimination policy interferes with the realization of the Club as a religious group. Under Amos, the removal of that impediment serves a secular function.
 
 
 97
 B. The Primary Effect of Advancing Religion.
 
 
 98
 In ascertaining whether the primary effect of the School's recognition would be to advance religion, the Court's analysis in Mergens and Amos is once again dispositive. In Mergens, the critical inquiry was whether the school "endorsed" the religious speech. 496 U.S. at 250, 110 S.Ct. at 2371. The Court specified that disclaimers of the type already devised by Roslyn High would guarantee that no reasonable student could conclude that the school was using its activities and influence to advance religion. Id. at 251, 110 S.Ct. at 2372. And as the Mergens Court made clear, the conduct of religious exercises in a school, with the school's sanction and under its "aegis," does not have the primary effect of advancing religion. Id. at 250-52, 110 S.Ct. at 2371-73. Nor is it impermissible, according to Mergens, for a club engaging in after-school prayers to have access to the school's bulletin boards, public address system, and newspaper. Id. at 247, 252, 110 S.Ct. at 2370, 2373. Finally, the Mergens Court has already found it immaterial that the religious club's announcements would have a captive audience composed of students who are required to attend school under compulsory attendance laws. Id. at 249-52, 110 S.Ct. at 2371-73; cf. Lee v. Weisman, 505 U.S. 577, 597-99, 112 S.Ct. 2649, 2661, 120 L.Ed.2d 467 (1992) (impermissible for public high school to have rabbi give opening prayer at graduation ceremony, "because the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid").
 
 
 99
 The School and the Anti-Defamation League raise all of these arguments anew. There is no indication, however, that the religious activities of the Walking on Water Club will be any different from the religious activities of the Bible club at issue in Mergens. The Walking on Water Club may fill an after-school classroom with musical prayers, solicit new members with posters, or announce its meetings over the public address system. But these activities do not distinguish the Club in any meaningful way from the club in Mergens; nor do they suggest that recognition of the Walking on Water Club would have the primary effect of advancing religion.
 
 
 100
 The salient difference between this case and Mergens, of course, is the dispensation that the Club needs with respect to the School's nondiscrimination policy. But exempting the Club from the nondiscrimination policy simply puts the Club on the same footing as non-religious clubs who make distinctions among their members on the basis of commitment. In this situation, an exemption is a policy of neutrality. See supra section III.C.
 
 
 101
 Even if the exemption from the nondiscrimination policy is viewed as a "benefit," enjoyed only by the Walking on Water Club (and other sectarian religious clubs), there still is no Establishment Clause violation. As the Court explained in Amos, the flow of a "benefit" only to a religious group does not mean that the government's actions are advancing religion. The School--like Congress in enacting § 702 of the Civil Rights Act--would simply be "allow[ing the Club] to advance religion." 483 U.S. at 337, 107 S.Ct. at 2869. The exemption here provides a "benefit" to a religious group, as did the property tax exemption upheld by the Court in Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). As in Walz, the benefit means that the religious group can do something it could not do before, and as a result may be able to better advance its religion. But allowing people with religious faith to advance their religions is not what is meant by "the establishment of religion," as the Court made clear in Walz: for the authors of the Religion Clauses, "the 'establishment' of religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." 397 U.S. at 668, 90 S.Ct. at 1411; see also Amos, 483 U.S. at 337, 107 S.Ct. at 2869. In other words, the state action itself must constitute an endorsement of religion. Cf. Mergens, 496 U.S. at 250, 110 S.Ct. at 2371 ("[T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect."). Since the exemption from the School's policy simply allows the Club to pursue a leadership policy that it reasonably considers critical to its ability to hold religious meetings at the school, and since Mergens decided that allowing such meetings does not constitute a state endorsement or advancement of religion, the exemption cannot be considered an endorsement by the School of the Hsus' religion or the Club's leadership policy. There is no showing that the exemption of the Walking on Water Club would constitute an endorsement of its activities. Absent such a showing, we can only conclude that the exemption would not have the primary effect of advancing religion.[27]
 
 
 102
 C. Excessive entanglement.
 
 
 103
 Mergens concluded that a school's recognition of a religious club under the Equal Access Act does not "impermissibly entangle government in the day-to-day surveillance or administration of religious activities," 496 U.S. at 253, 110 S.Ct. at 2373-74, because under the Equal Access Act,
 
 
 104
 faculty monitors may not participate in any religious meetings, ... nonschool persons may not direct, control, or regularly attend activities of student groups[,] ... [and] school officials may not promote, lead or participate in any such meeting.
 
 
 105
 Id. (citing 20 U.S.C. § 4071(c)(2), (3), and (5)).
 
 
 106
 The potential source of entanglement in our case that was not present in Mergens is the Club's policy limiting its leaders to those who "accept Jesus Christ as savior"--which, according to the Hsus' counsel, means all Christians. The School worries that, if there is an argument within the Club about whether a particular student has or has not in fact "accepted Jesus Christ as savior," the School would be forced to mediate the dispute and to adjudicate the student's standing as a Christian. We agree that certification of religious qualifications would constitute excessive entanglement in a religious group's internal affairs.
 
 
 107
 But the School's anxiety is unwarranted. Leadership disputes that hinge on a student's supposed religious qualifications can be resolved internally by the members of the Club, who have the option, if there is a schism, of splitting the group into two different clubs. Alternatively, if the School is faced with rival claimants to leadership, it may treat each faction as a separate club. If the squabbling gets out of hand, then (as counsel for the Hsus suggested at oral argument) the School would be justified in withdrawing recognition of the Club for "materially and substantially interfer[ing] with the orderly conduct" of the School. See 20 U.S.C. § 4071(c)(4). And of course, under Tinker and the line of cases discussed infra in section V.B., the accommodation of student expression does not require the School to lay down any instrument it needs to maintain discipline. Since we do not see how the School would necessarily become embroiled in the internal workings of the Club, we conclude that recognition will not entangle the School in the Club's religious activities.
 
 
 108
 In short, the Establishment Clause does not bar the School from recognizing the Walking on Water Club and its leadership provision.
 
 V. Equal Protection and Tinker
 
 109
 The District argues that if it is forced to recognize the Club under the Equal Access Act, it will also be forced to abrogate its nondiscrimination rule entirely, and that the School will thereby lose the power to combat bias and discrimination. The School paints a picture of balkanized, hate-filled public schools where discriminatory clubs, formed by racists, bigots, and Nazi sympathizers, proliferate. This, says the School, cannot be what the Equal Access Act requires.
 
 
 110
 The Hsus suggest that this is precisely what the Act requires. In response to questioning by the district court, counsel for the Hsus stated that the Walking on Water Club could exclude African-Americans if it wanted, 876 F.Supp. at 463, and that the School might well have to recognize a group of "skinheads" who wanted to exclude African-Americans.
 
 
 111
 We reject the arguments of both parties. First, the parties disregard the influence of the Equal Protection Clause, which is a well-fortified line of defense against invidious discrimination. Second, the Tinker line of cases--which allows public schools to restrict free speech rights when student speech "materially and substantially interferes" with the school--limits student freedom more sharply than the parties concede. Congressional supporters of the Equal Access Act made it clear during the floor debates that the Act adopted these limitations,[28] and that they did not intend the Act to open the school doors to hate groups, cults, and proselytizers. See 130 Cong. Rec. 19,232 (statement of Sen. Hatfield) (Equal Protection Clause will protect against discriminatory student groups); id. at 19,244 (Sen. Mitchell) (language of Act allows schools to bar cults and hate groups); id. at 20,941 (Rep. Goodling) (same); id. at 19,228 (Sen. Danforth) (language of Act allows schools to bar cults and proselytizers). We discuss these two types of protection in turn.
 
 
 112
 A. Equal Protection.
 
 
 113
 The Hsus argue that discrimination by an after-school student group that is suitably distanced from the school is a purely private action and that the Equal Protection Clause therefore does not come into play. The Hsus admit, however, that their club cannot exist without authorization from the School; indeed, the School's recognition is what the Hsus are seeking here. Thus, even though the Equal Access Act states that a school may not "sponsor[ ]" a club like the Hsus', 20 U.S.C. § 4071(c)(2), the School's grant of recognition, which the club needs in order to gain access to school facilities, authorizes and enables the club to pursue its exclusionary policy. In Amos, the state action was evident: Congress had enacted an exemption of religious groups from a generally applicable ban on religious discrimination in employment decisions. 483 U.S. at 329, 107 S.Ct. at 2865. The state action here is similar: recognition of the Club would mean an exemption for religious after-school clubs from one part of the School's nondiscrimination policy. This exemption would allow religious clubs to discriminate in a way that other clubs may not. Thus, a school's recognition of a club that discriminates does constitute state action and does implicate the Equal Protection Clause.
 
 
 114
 The exemption at issue in Amos, § 702 of the Civil Rights Act of 1964, was challenged under both the Establishment and Equal Protection Clauses. After finding no Establishment Clause violation, the Court held that the Equal Protection Clause challenge should be analyzed under the rational basis test:
 
 
 115
 [L]aws discriminating among religions are subject to strict scrutiny.... [But i]n cases such as these, where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute that passes the Lemon test. The proper inquiry is whether [the state actor] has chosen a rational classification to further a legitimate end.
 
 
 116
 Id. at 339, 107 S.Ct. at 2870. Section 702 met this standard because its purpose was to "alleviat[e] significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Id.
 
 
 117
 Justice Brennan's concurrence discussed in more detail why the rational basis test is appropriate for state action that allows religious groups to discriminate on the basis of religion:
 
 
 118
 We are willing to countenance the [religious group's] imposition of [a religious] condition because we deem it vital that, if certain activities constitute part of a religious community's practice, then a religious organization should be able to require that only members of its community perform those activities.
 
 
 119
 Id. at 342-43, 107 S.Ct. at 2872. This passage helps explain why recognition of the Walking on Water Club does not also require the School to accommodate groups of student racists. What the Equal Protection Clause forbids is state action that implements or sanctions invidious discrimination. The use of heightened scrutiny for all cases of racial and sex discrimination implements both the suspicion that such discrimination is almost always invidious, and the policy that only the strongest reasons justify advantages based on race or sex. See Loving v. Virginia, 388 U.S. 1, 10-11, 87 S.Ct. 1817, 1822-23, 18 L.Ed.2d 1010 (1967); Craig v. Boren, 429 U.S. 190, 197-98, 97 S.Ct. 451, 456-57, 50 L.Ed.2d 397 (1976). Similar suspicion accompanies the granting of benefits by the state to one religious group but not others. See Amos, 483 U.S. at 339, 107 S.Ct. at 2870. If any of these types of discrimination were present here, we would have a different case. But because religious discrimination by a religious group is "vital" to the group's religious mission and the ability of the group to define itself on the basis of shared faith, no great suspicion attaches to a government decision to allow it.
 
 
 120
 The Court in Amos was considering allowances made for a church, which of course the Walking on Water Club is not. But this Club is still a religious community that has the same need to define itself as other religious communities, notwithstanding its reliance on a public school to sanction its existence and to give it a roof. As in Amos, the state's accommodation of religious discrimination by a religious group allows the group to define and express itself in religious terms--a state motivation that is benign and a state purpose that is legitimate. In addition, state actions that allow religious discrimination only by religious groups impose no burdens on non-religious groups. Nor do such actions in any way subordinate or stigmatize non-religious groups by suggesting that they are inferior, since they have their own ways of pursuing legitimate exclusions that help them define their groups and promote their agendas. Having considered the purpose for the exemption that the Club needs from the School, and the effect of exempting the Club from the School's nondiscrimination policy, we conclude that there is nothing invidious about it. See Plyler v. Doe, 457 U.S. 202, 216-17 & n. 14, 102 S.Ct. 2382, 2394-95 & n. 14, 72 L.Ed.2d 786 (1982) (classifications based on prejudice are generally invidious); Brown v. Board of Educ., 347 U.S. 483, 494, 74 S.Ct. 686, 691-92, 98 L.Ed. 873 (1954) (importance of stigma); Strauder v. West Virginia, 100 U.S. 303, 308, 25 L.Ed. 664 (1879) (same).
 
 
 121
 Even if a school's accommodation of a religious group is motivated by the legitimate desire to facilitate the group's self-expression, and even if that accommodation does no harm to non-religious groups, the particular type of discrimination practiced by the group may lead to a finding of invidiousness. If authorized by the School, private act of invidious discrimination by a student club also constitutes a state act of invidious discrimination. Treating one religion differently than another will almost always be invidious. But determining whether discrimination is invidious in a particular case depends on an understanding of the context that informs and characterizes that discrimination. Understanding this context requires consideration of who is discriminating. The Walking on Water Club wishes to discriminate in one respect on the basis of faith. As the district court said, this is a type of discrimination that would be unlawful for the School "to engage in directly." 876 F.Supp. at 455. But the critical distinction here is that by granting the Walking on Water Club recognition on the Club's terms, the School would not be engaging in this type of discrimination directly. It would simply be letting the Walking on Water Club do it.
 
 
 122
 Nothing in the record or the School's arguments suggests that the Walking on Water Club insists on Christian leaders because of animus against people of other religions. Since the Club exists solely to engage in Christian "praise of God," non-Christians suffer no articulable disadvantage by being unable to lead the Club's prayers and devotions. Nor is there any indication that the exclusion of non-Christians from Club leadership will subordinate or stigmatize them. Were any of these facts otherwise, the School might be justified in refusing an exemption from its nondiscrimination policy. See Bob Jones Univ. v. United States, 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983) (IRS's refusal to grant tax-exempt status to a university with racially discriminatory admissions policies upheld using strict scrutiny analysis under the Free Exercise Clause, because of the government's "fundamental, overriding interest in eradicating racial discrimination in education").[29]
 
 
 123
 The School does not claim that any of these traditional signs of invidious discrimination are present. Instead, it argues that (i) all forms of discrimination on the basis of religion are invidious in all contexts, and (ii) allowing the Walking on Water Club to discriminate even on an innocuous basis will pave the way for noxious forms of discrimination. We reject the first argument for the reasons stated above, since the invidiousness of religious discrimination will vary depending on the surrounding context. The concern expressed in the School's second argument is unwarranted. The Equal Protection Clause and the School's nondiscrimination policy still allow the School to resist these destructive forms of discrimination, precisely because they are invidious. But since there is no invidious discrimination here, we conclude that an exemption for the Walking on Water Club is consistent with the Equal Protection Clause.
 
 B. Tinker
 
 124
 The School's power to prohibit invidious discrimination by student clubs is reinforced by a line of Supreme Court cases beginning with Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In Tinker, the Court held that public schools may suppress speech or expressive behavior that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school" or "impinge[s] upon the rights of other students," even if the expression could not be suppressed outside a public school. Id. at 509, 89 S.Ct. at 738 (internal quotations omitted). See also Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) ("A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school." (internal quotations and citations omitted)). After all, one purpose of public education is to inculcate students with values that will make them better citizens:
 
 
 125
 The[ ] fundamental values of "habits and manners of civility" essential to a democratic society must, of course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular. But these "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior.
 
 
 126
 Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 681, 106 S.Ct. 3159, 3163, 92 L.Ed.2d 549 (1986).
 
 
 127
 True, we analyze this case under the Equal Access Act, while the Tinker line of cases concerned the limits on First Amendment rights in public schools. Nevertheless, the Equal Access Act strikes the same balance that the Supreme Court has struck between First Amendment free speech rights and a public school's right to maintain order: the Act grants broad free speech rights under § 4071(a), and restricts those rights, under § 4071(c)(4), when club meetings "materially and substantially interfere with the orderly conduct of educational activities within the school."[30] See also 20 U.S.C. § 4071(f).
 
 
 128
 Thus, a school may deny recognition to a student group that would otherwise be entitled to protection under the Equal Access Act, if there are grounds for concluding that recognition of the group would materially and substantially interfere with the school's overarching mission to educate its students, as this standard has been explained by Tinker, Fraser, and Kuhlmeier. Valid grounds may include a school's concerns that a club's discriminatory policies would disadvantage, subordinate, or stigmatize the excluded students, debase the morals of students who practice the exclusion, or frustrate the teaching of the "fundamental values necessary to the maintenance of a democratic political system." Fraser, 478 U.S. at 681, 106 S.Ct. at 3163 (internal quotations omitted). These values include "tolerance of divergent political and religious views, even when the views expressed may be unpopular," id., but also "disfavor the use of terms of debate highly offensive or highly threatening to others."[31] Id. at 683, 106 S.Ct. at 3164. See Trachtman v. Anker, 563 F.2d 512, 519-20 (2d Cir.1977) (school can prohibit student newspaper's attempt to distribute sex questionnaire to 9th and 10th graders, because substantial basis exists for concluding that they will be subjected to "peer contacts and pressures which may result in emotional disturbance"), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978).
 
 
 129
 The School District contends that its nondiscrimination policy is the only way it can achieve an important educational objective: that students be free of any type of "discrimination." "Discrimination," says the District, "creates multiple 'classes' of students, balkanizes the student community and breeds contempt, distrust and dissen[s]ion." But of course, high school students are subjected to discrimination and selection all the time: sports teams may be divided into girls and boys teams, some students may be allowed on the honor roll and others may not be, upper-level courses may be open to juniors and seniors but not to others, extracurricular activities may be closed to students who do not maintain a certain grade point average, see Pope v. East Brunswick Bd. of Ed., 12 F.3d 1244, 1255-56 (3d Cir.1993), and leadership positions in a club like Students Against Drugs may be inaccessible to students who advocate the legalization of drugs. Clearly, some types of discrimination are permissible in a high school setting, and some are not. The district court concluded that "a school-recognized club that is permitted to discriminate on the basis of religion likely would be disruptive to the educational mission of the school," because it would be "invidious" and would impinge on the "rights of other Roslyn students to be free from discrimination in school." 876 F.Supp. at 462. But as we explained in section V.A., supra, religious discrimination is not automatically invidious in a religious club; and the right of other students to be free from invidious discrimination is not infringed here. As the Court said in Fraser, a school may encourage "tolerance of divergent political and religious views" as part of its mission to inculcate "fundamental values," 478 U.S. at 681, 106 S.Ct. at 3163, although this type of tolerance need not extend to "highly offensive or highly threatening" speech. Id. at 683, 106 S.Ct. at 3163. The School does not (and we think cannot) argue that the discriminatory leadership policy of the Walking on Water Club is highly offensive or threatening.
 
 
 130
 It is a delicate task to supervise student discrimination and exclusion to ensure that it is consistent with "fundamental values" and is not "invidious." Schools may encounter student religious groups that want to discriminate invidiously on the basis of religion, by excluding others out of bias or by stigmatizing those excluded. We admit that the line between invidious and non-invidious discrimination does not glow in the dark. But for better or worse, schools have had to draw that line ever since the Tinker case in 1969.
 
 
 131
 In doing so, public school administrators must be given a great deal of autonomy in deciding how best to run their schools: "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." Kuhlmeier, 484 U.S. at 273, 108 S.Ct. at 571. We must recognize, however, that the Equal Access Act is a definite, though measured, interference in these purely local decisions. A school's conclusory statement that prayer meetings will substantially and materially impede the orderly conduct of the school is an insufficient weight in the balance struck by the Act.[32] See Tinker, 393 U.S. at 508, 89 S.Ct. at 737 ("[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."). And here, the School offers nothing beyond these conclusory assertions. Based on this record, we conclude that allowing the Walking on Water Club to guarantee that three of its prayer leaders will be Christians does not constitute "substantial and material interference" with the School's mission of educating and disciplining.
 
 VI. Preliminary Injunction
 
 132
 Having determined that the Hsus are likely to succeed on their claim that the Equal Access Act requires Roslyn High School to recognize the Walking on Water Club with its leadership provision (as applied to three of its leaders), and that this recognition is constitutional, we conclude that the second prong of the preliminary injunction standard (likelihood of success on the merits) is satisfied. The first prong is satisfied as well, since Timothy Hsu has been suffering and continues to suffer irreparable harm. The Equal Access Act protects free speech rights. As mentioned above, we follow the Supreme Court and take no position on whether the Equal Access Act is required by the First Amendment or whether it extends free speech rights beyond the scope of the First Amendment. See supra note 6. Either way, the Act protects "expressive liberties," and we therefore take guidance from the Supreme Court's oft-quoted statement that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); see Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir.1991) (statement in Elrod is justified by "our historical commitment to expressive liberties"). In past cases, we have extended that principle to conclude that prisoners are irreparably injured when they are denied access to published reports containing criticisms of prison conditions, Abdul Wali v. Coughlin, 754 F.2d 1015, 1026 (2d Cir.1985) (quoting Elrod ), and that parents of public school students are irreparably injured when the school provides separate remedial education classes to a discrete religious group (even though the parents' "expressive liberties" were not infringed). Parents' Ass'n v. Quinones, 803 F.2d 1235, 1242 (2d Cir.1986) (quoting Elrod ). We believe that the denial for one year (now two years) of the right to pray in an after-school Bible group as envisioned by the Hsus also constitutes "irreparable injury," and that the Hsus are entitled to the issuance of a preliminary injunction so that the injury will cease.
 
 VII. Conclusion
 
 133
 Our holding is narrow. We do not hold that administrators must allow religious discrimination in the schools. Religious discrimination by student clubs will often be invidious and will rarely fall within our holding. However, when a sectarian religious club discriminates on the basis of religion for the purpose of assuring the sectarian religious character of its meetings, a school must allow it to do so unless that club's specific form of discrimination would be invidious (and would thereby violate the equal protection rights of other students), or would otherwise disrupt or impair the school's educational mission. Courts must be extremely reluctant to overrule the judgment of local school administrators who are responsible for making these sensitive decisions. But in this case, the only judgment Roslyn High School has made is that every instance of religious discrimination by a student group is invidious and disrupts the school's mission. Invidious discrimination entails more context-specific judgments. We hold only that, on this record, the Hsus are likely to succeed on that part of their Equal Access Act claim that relates to the Club's President, Vice-President, and Music Coordinator. We therefore affirm in part, reverse in part, and remand for the issuance of an injunction and additional proceedings (if necessary) that are consistent with this opinion. See Patton v. Dole, 806 F.2d 24, 31 (2d Cir.1986) ("Although reversal of an order denying an application for a preliminary injunction is customarily accompanied by a directive that the district court conduct a new hearing on remand, an appellate court, on a finding of merit in plaintiff's case, can in the alternative direct the district court to issue the injunction."); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2962 at 448 (1995).
 
 
 134
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part.
 
 
 135
 Much, perhaps too much, ink has been spilt in attempts to define the proper relationship between government and religion. Accordingly, I will explain as briefly as possible why I concur only in part with Judge Jacobs' thorough opinion.
 
 
 136
 At the outset, although the issue is not before us, I am not convinced that the Walking on Water Club is precluded from limiting its membership to Christians. See 20 U.S.C. § 4071(a); New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 13, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988). Conformity by members of a religious organization to the standard of morals required of members has been recognized as a proper function of religious establishments since the early case of Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871).
 
 
 137
 Turning to the question now at issue, I would hold that the right to select all of Walking on Water Club's officers was solely the prerogative of that concededly religious club. The following language from Justice Brennan's concurring opinion in Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 341-42, 107 S.Ct. 2862, 2871-72, 97 L.Ed.2d 273 (1987), although addressed specifically to religious corporations, is, I think, clearly appropriate here:
 
 
 138
 [R]eligious organizations have an interest in autonomy in ordering their internal affairs, so that they may be free to:
 
 
 139
 "select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions. Religion includes important communal elements for most believers. They exercise their religion through religious organizations, and these organizations must be protected by the [Free Exercise] [C]lause." Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L.Rev. 1373, 1389 (1981).
 
 
 140
 See also Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696[96 S.Ct. 2372, 49 L.Ed.2d 151] (1976)(church has interest in effecting binding resolution of internal governance disputes); Kedroff v. Saint Nicholas Cathedral, 344 U.S. 94[73 S.Ct. 143, 97 L.Ed. 120] (1952) (state statute purporting to transfer administrative control from one church authority to another violates Free Exercise Clause). For many individuals, religious activity derives meaning in large measure from participation in a larger religious community. Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals. Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself. Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well.
 
 
 141
 Id. (footnote omitted). See also Minker v. Baltimore Annual Conference of United Methodist Church, 894 F.2d 1354, 1356 (D.C.Cir.1990); Dowd v. Society of St. Columbans, 861 F.2d 761, 764 (1st Cir.1988); Simpson v. Wells Lamont Corp., 494 F.2d 490, 493-94 (5th Cir.1974); McClure v. Salvation Army, 460 F.2d 553, 558-61 (5th Cir.), cert. denied, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).
 
 
 142
 I believe that the Club members are better qualified than are we to determine the duties and necessary qualities of all their leaders.
 
 
 
 [1]
 "[I]n granting or refusing interlocutory injunctions the court shall [ ] set forth the findings of fact ...," which we must accept unless they are "clearly erroneous." Fed.R.Civ.P. 52(a). Here, the district court relied on the facts as alleged by the plaintiffs without actually making any independent factual determinations. 876 F.Supp. 445, 448 (E.D.N.Y.1995). As in Sampson v. Murray, 415 U.S. 61, 86 n. 58, 94 S.Ct. 937, 951 n. 58, 39 L.Ed.2d 166 (1974), where the district court failed to make any findings of fact under Rule 52(a), "we do not think that we are thereby foreclosed from examining the record to determine if sufficient allegations or sufficient evidence supports" the district court's injunctive ruling. See also Professional Ass'n of College Educators v. El Paso County Community College Dist., 730 F.2d 258, 273 (5th Cir.) (examining the record after district court issued injunctive ruling without making "express findings of fact"), cert. denied, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). We therefore examine the record and, given the preliminary procedural posture of this case, ask whether injunctive relief is warranted based on the undisputed facts. See Genovese Drug Stores, Inc. v. Connecticut Packing Co., 732 F.2d 286, 292 (2d Cir.1984) (reversing "[o]n the undisputed facts" a district court's injunctive ruling)
 
 
 [2]
 The District claims that "student clubs typically have written constitutions" and that District schools ask students to submit a constitution "where the purpose and activities of a proposed club are not clear." The plaintiffs suggest that the requirement of a written constitution was improvised to thwart the creation of the Bible Club, and point to a memo sent on February 10, 1994 by Roslyn High principal Howard Rubin to student club leaders:
 We have been informed by the school attorney that every club or activity at Roslyn High School must have a constitution. If your club or activity has a constitution, please return it to my office by Monday, February 14. If your club or activity does not have a constitution, please indicate that below.
 The District claims that all clubs identified as not having constitutions were asked to submit one to the School.
 
 
 [3]
 We are satisfied that we retain jurisdiction to decide this case notwithstanding Emily Hsu's intervening graduation. Although the suit is moot as to her to the extent that she seeks injunctive relief, Fox v. Board of Trustees, 42 F.3d 135, 140 (2d Cir.1994) (injunctive claims are mooted for university students who graduate because no redress is available), cert. denied, --- U.S. ----, 115 S.Ct. 2634, 132 L.Ed.2d 873 (1995); Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir.1993) (graduation of university students on women's ice hockey team moots Title IX claim), Timothy Hsu is currently a junior at the School. Jane Shin and Johnny Whang, students who originally joined with Emily in her effort to form the Bible Club, are not named as plaintiffs in the suit, and there is no way to tell from the record whether they remain students at Roslyn High. But at oral argument, counsel for both sides confirmed that there are students--in addition to Timothy Hsu--who currently wish to form the Walking on Water Club as defined by its constitution. We therefore assume this to be the case
 
 
 [4]
 The defendants cross-appeal from the order denying their motion for judgment on the pleadings. However, that order is neither a "final decision" under 28 U.S.C. § 1291 nor an interlocutory order that falls within 28 U.S.C. § 1292. We therefore consider the arguments made on the cross-appeal only to the extent that they bear upon the issues in the main appeal
 
 
 [5]
 Although the district court concluded each section of its analysis with language appropriate to the disposition of a preliminary injunction motion, 876 F.Supp. at 456 ("Accordingly, plaintiffs have failed to demonstrate a likelihood of success or sufficiently serious questions ...."); id. at 463 (same), its opinion actually rejects all of the plaintiffs' federal claims on the merits after giving them extensive consideration. Id. at 454 ("Providing access to the bible club on the same basis as all other noncurriculum-related student clubs amounts to 'equal access.' "); id. at 460 ("the Establishment Clause is not violated"); id. at 462 (the Free Exercise Clause and RFRA "do[ ] not mandate" that the School recognize the Club); id. (the Free Speech Clause claim is "of doubtful merit"); id. at 462 n. 21 (the equal protection and due process claims "have little merit"); id. at 463 (the plaintiffs' free association rights were not violated). Thus, even though the district court ended its opinion by denying the defendants' motion for judgment on the pleadings, "without prejudice to their right to move for summary judgment following discovery," 876 F.Supp. at 463, the future summary judgment motion would have been little more than a formality
 
 
 [6]
 Whether this right falls within or without the scope of the First Amendment is a question explicitly left unanswered by the Supreme Court. See Board of Educ. v. Mergens, 496 U.S. 226, 247, 110 S.Ct. 2356, 2370, 110 L.Ed.2d 191 (1990)
 
 
 [7]
 A school has a "limited open forum" if it "grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b)
 
 
 [8]
 The Hsus' argument on the Equal Access Act (and the defendants' response) focuses almost exclusively on the denial of "equal access." Section 4071(a) of the Act also creates a cause of action when a school denies "a fair opportunity" to students who wish to conduct certain meetings, or "discriminate[s] against" these students. Following the parties' lead, we limit our discussion to the term "equal access" and draw no conclusions about the other two terms
 
 
 [9]
 After the bill that became the Equal Access Act passed the House and was reported out of committee in the Senate, it was extensively rewritten. The committee reports are therefore unilluminating. Mergens, 496 U.S. at 238, 110 S.Ct. at 2365-66; Douglas Laycock, Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers, 81 Nw. U.L.Rev. 1, 37 (1986). See S.Rep. No. 151, 98th Cong., 1st Sess. (1983) and S.Rep. No. 357, 98th Cong.2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 2306 and 2348, respectively. Congress debated the final version of the bill on June 27 and July 25, 1984
 
 
 [10]
 See 130 Cong. Rec. at 19,224 (Sen. Gorton) ("I am convinced that the limited open forum ... clearly covers the Ku Klux Klan ...."); id. at 19,229 (Sen. Danforth) ("[The Act] make[s] it clear that the school administration does have, does continue to have inherent power to prevent the unrestrained, intensive, extreme psychological pressure which could be utilized by some religious groups to attempt to bring other kids within the religious community."); id. at 20,938 (Rep. Kastenmeier) ("I--and school administrators--are concerned that groups such as the Ku Klux Klan or the Nazis may for the first time be able to claim access to secondary schools.")
 
 
 [11]
 See also 130 Cong. Rec. at 19,225 (Sen. Hatfield) ("I am willing to take my risk on the expansion of freedom and rights [rather] than trying to nail them down so specifically, so tightly, that we foreclose the necessity of the court interpreting them in the long run anyway or making sure that some particular momentary problem that we foresee is taken care of.")
 
 
 [12]
 The school argued that all 30 of its official extracurricular groups, including the Chess Club and "Subsurfers," were "curriculum related." The Court disagreed, and held that the school therefore maintained a "limited open forum" under the statute. Mergens, 496 U.S. at 243-46, 110 S.Ct. at 2368-70
 
 
 [13]
 Certainly, the exclusion resembles conduct in at least one sense, since non-Christians are barred from running for leadership positions. But speech that has concrete effects is not automatically converted into nonexpressive conduct. See Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). And, of course, conduct that is expressive can receive the same protection as "pure speech." See, e.g., Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 505, 89 S.Ct. 733, 735-36, 21 L.Ed.2d 731 (1969) (public school students wearing black armbands to protest Vietnam War receive protection under the Free Speech Clause)
 
 
 [14]
 In the past, the parade organizers had also excluded the Ku Klux Klan and an anti-busing group. Hurley, --- U.S. at ----, 115 S.Ct. at 2342
 
 
 [15]
 See supra note 6 and accompanying text
 
 
 [16]
 We note that under the Act, "nonschool persons may not direct, conduct, control, or regularly attend activities of student groups." 20 U.S.C. § 4071(c)(5). This would therefore prohibit the Club's "guest speakers" from acting as substitute prayer leaders
 
 
 [17]
 It is difficult to understand how allowing non-Christians to attend the meetings and sing (or listen to) Christian prayers would change the Club's speech
 
 
 [18]
 These distinctions, which are not easy for anyone to draw (whether federal judges or school principals), spring necessarily from Congress's use of the undefined term "religious speech." But even without the Equal Access Act, courts would still be required to determine the contours of the term "religion." For instance, the First Amendment's command that the state may not "prohibit[ ] the free exercise [of religion]" requires us to ask whether a belief is "religious" and "sincerely held." We do not hold that this division between Activities Coordinator and Secretary on the one hand, and President, Vice-President, and Music Coordinator on the other, is the only decision that school administrators could have made to avoid being reversed by the courts. Rather, taking as our baseline the District's decision to prohibit the Club from applying its leadership provision to any of its officers, we have asked what the Hsus' minimum entitlement is under the Equal Access Act, based on this factual record
 
 
 [19]
 The complaint lists 35 extracurricular clubs granted recognition by the School: American Field Service; Art Club; Astronomy Club; Band; Chamber Singers; Chess Club; Chorus; Computer Club; Fashion Club; Forensics; French Club; Freshman Orientation; Harbor Hill Light (the yearbook); Hilltop Beacon (the newspaper); Human Relations Club; International Ambassadors Club; Jazz Band; Key Club; Math Club; Mock Trial; Model Congress; National Honor Society; Organization of Class Councils; Peer Counseling; Roslyn Athletics Club; Roslyn Singers; Royal Crown Players; Science Olympiad; Spanish Club; Student Prints (a literary magazine); Students Against Drunk Driving; Students for Social Responsibility; Students Protecting the Environment Against Contamination; Students for the Ethical Treatment of Animals; and Volunteers for the Education of Retarded Youths
 
 
 [20]
 A religious-based exclusion would have different meanings in different groups. A hypothetical chess club that excluded Muslims could not claim that the exclusion was necessary to guarantee committed chess players. The Hsus' insistence on the exclusion of non-Christians from leadership positions, however, is not a matter of prejudice or clique, just as the girls soccer team at Roslyn High probably does not exclude boys out of enmity. The exclusion in both instances serves a legitimate self-definitional goal for the group. This essential and direct link between the legitimate purpose of the club and the principle of exclusion necessary to achieve that purpose distinguishes the girls soccer team and the Walking on Water Club from the hypothetical Chess Club
 
 
 [21]
 The court did not definitively pass on the issue of whether the School's nondiscrimination policy "inhibit[ed] or prevent[ed] the bible club's members from selecting those students they desire to lead the club," although it held that this restriction on the Club's freedom would not be "impermissibl[e]." 876 F.Supp. at 455
 
 
 [22]
 For the reasons that we reject the Hsus' Equal Access Act claim with regard to the Secretary and Activities Coordinator, we also reject their RFRA, Free Exercise Clause, Free Speech Clause, and other constitutional claims with regard to these two officers
 
 
 [23]
 The only portion of Justice O'Connor's opinion in Mergens that did not attract a majority was the section concerning the Establishment Clause. Justice Marshall, concurring separately with Justice Brennan, agreed with Justice O'Connor's Establishment Clause analysis, 496 U.S. at 263, 110 S.Ct. at 2378-79, stressing however that the school could avoid an Establishment Clause violation only if it "fully disassociate[d] itself from the club's religious speech and avoid[ed] appearing to sponsor or endorse the club's goals." Id. at 270, 110 S.Ct. at 2382. Justice Kennedy, concurring separately with Justice Scalia, concluded that the Equal Access Act did not violate the Establishment Clause because it did not result in the provision of "direct benefits to religion," and because there was no "coercion" to participate in a religious club. Id. at 260-61, 110 S.Ct. at 2377-78
 
 
 [24]
 We discuss the Court's Equal Protection Clause holding in section V.A., infra
 
 
 [25]
 Parallelling Mergens, the Court in Amos explicitly reserved the question of whether the accommodation embodied in § 702 was required by the First Amendment. 483 U.S. at 339 n. 17, 107 S.Ct. at 2870 n. 17
 
 
 [26]
 The Lemon test is quite evidently an endangered doctrine. See Rosenberger v. University of Va., --- U.S. ----, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (not mentioning Lemon ); Board of Educ. of Kiryas Joel v. Grumet, --- U.S. ----, ---- - ----, 114 S.Ct. 2481, 2494-95, 129 L.Ed.2d 546 (1994) (Blackmun, J., concurring) (majority's analysis, while not mentioning Lemon, is based on cases which based their analysis on Lemon ); Zobrest v. Catalina Foothills School Dist., 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (not mentioning Lemon ); Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993) ("[T]here is a proper way to inter an established decision and Lemon ... has not been overruled."); id. at 396-400, 113 S.Ct. at 2149-50 (Scalia, J., dissenting) ("Lemon stalks our Establishment Clause jurisprudence once again."). Nevertheless, we follow the three-prong framework used by the Court in Mergens (the only case in which the Court has discussed the Establishment Clause implications of the Equal Access Act), although we note that the critical factor in the first two prongs of the test in Mergens was whether the School's actions constituted an "endorsement" of the Bible club. See Rosenberger, --- U.S. at ----, 115 S.Ct. at 2525 (O'Connor, J., concurring) (" 'the message [must be] one of neutrality rather than endorsement' ") (quoting Mergens, 496 U.S. at 248, 110 S.Ct. at 2370-71)
 
 
 [27]
 The Anti-Defamation League points for support to Parents' Ass'n v. Quinones, 803 F.2d 1235 (2d Cir.1986), a case that predates both Mergens and Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (no Establishment Clause violation to allow religious community group to show religious-oriented film in school classroom after school). In Quinones, a public school, required by federal law to give remedial education to all "educationally deprived" students in the school district, provided remedial classes to 400 girls who attended a private Hasidic elementary school. The public school built new walls closing off a previously open corridor so that the Hasidic students would be insulated from the largely-Hispanic public school population, as the Hasidic leaders and parents insisted. Yiddish-speaking teachers were provided for the classes, and "English as a Second Language" courses were taught, even though such courses were not available to the largely Spanish-speaking public school students. 803 F.2d at 1237-38
 We held that the school violated the Establishment Clause by creating a "symbolic link" between the school and the Hasidim "that is likely to have a magnified negative impact on the minds" of the students. Id. at 1241. We explained:
 The lengths to which the [school] has gone to cater to these religious views, which are inherently divisive, are plainly likely to be perceived, by the Hasidim and others, as governmental support for the separatist tenets of the Hasidic faith. Worse still, to impressionable young minds, the [school's] Plan may appear to endorse not only separatism, but the derogatory rationale for separatism expressed by some of the Hasidim.
 Id. Having renovated the school solely to satisfy one religion's demand that there be no contact with public school students, the school in Quinones could not avoid sending a message of endorsement. This case is different. Here, the School is providing ordinary classroom space, as it does to other school groups, and has explicitly disclaimed any endorsement of the Club's activities. In addition, the "benefit" given to the Club (an exemption from the ban on religious discrimination) could not be desired by non-religious groups for any non-invidious purpose. The Hasidic girls, on the other hand, were provided with an exclusive benefit (English as a Second Language courses) that the other students legitimately wanted and may have needed. Finally, the school's support for the Hasidim had "a magnified negative impact on the minds" of the students because of the sect's "derogatory rationale [behind its policy of] separatism." Here, nothing suggests that the Club's rationale is "derogatory."
 
 
 [28]
 Subsections 4071(d)(5) and (d)(7) incorporate the Equal Protection Clause's constitutional limitations: "Nothing in this [Act] shall be construed to authorize [a school] ... (5) to sanction meetings that are otherwise unlawful ... or (7) to abridge the constitutional rights of any person." The protection provided by the Tinker line of cases is incorporated in subsections 4071(c)(4) and 4071(f): subsection 4071(c)(4) provides that a school offers a group "a fair opportunity" to meet if it "uniformly provides," inter alia, that "the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school"; subsection 4071(f) provides that, "Nothing in this [Act] shall be construed to limit the authority of the school ... to maintain order and discipline on school premises [or] to protect the well-being of students and faculty."
 
 
 [29]
 The district court cited Bob Jones in equating "racial discrimination in education" with "discrimination based on religion in the school setting." 876 F.Supp. at 459. But as we have discussed, discrimination based on religion, depending on its contextual meaning, may properly be viewed with less suspicion than discrimination based on race (which is invariably subjected to the highest level of scrutiny)
 
 
 [30]
 This phrase differs only immaterially from the standard in Tinker, which allows schools to prohibit expression that interferes with "appropriate discipline." The Act allows the suppression of expression that interferes with "the orderly conduct of educational activities." The phrase "educational activities" of course embraces practically everything schools do, including the availability of extracurricular opportunities
 
 
 [31]
 Supporters of the Equal Access Act understood the Act to preserve the authority of secondary schools to keep proselytizers from disrupting the educational process. See, e.g., 130 Cong. Rec. 19,229 (statement of Sen. Danforth) (under the Act, "the school administration does have, does continue to have inherent power to prevent the unrestrained, intensive, extreme psychological pressure which could be utilized by some religious groups to attempt to bring other kids within the religious community"). The Walking on Water Club's constitution states that the Club "would like to spread the Good News of God and His word." There is no indication in the present record that this statement is meant to express anything other than a desire to "spread" Christianity to those non-Christians who voluntarily attend the Club's meetings. Other attempts to "spread" religion in a school might well be treated differently by school administrators
 
 
 [32]
 The district court found it "determinative" that the intent underlying the School's nondiscrimination policy was not to "suppress[ ] ... religious speech or beliefs, but [to] further[ ] the School's interest in protecting the well-being of all students." 876 F.Supp. at 455. But as the Court explained in Tinker, the fact that a school's suppression of student expression is well-intentioned does not make the suppression permissible. Tinker, 393 U.S. at 508, 89 S.Ct. at 737 (school's suppression of black armbands based on "fear of a disturbance from the wearing of the armbands" held impermissible, notwithstanding district court's finding that the fear was reasonable)